May it please the Court, my name is Catherine Wanamaker, and I'm here for the appellant of South Carolina Coastal Conservation League. This case concerns two authorizations issued by the Corps of Engineers for the creation of a saltwater mitigation bank on property owned by South Coast Management Group in the Lower Savannah River Estuary. The Corps arbitrarily approved this project in violation of its own regulations by calling it a restoration when in fact it is the conversion of 485 acres of freshwater wetlands that are extremely rare, very productive, that other districts of the Corps have worked for years to preserve. Unfortunately in district court, the case was dismissed as moot based on one argument only made by South Coast, and that is that some saltwater intrusion had happened at the site and thus our case was moot because the harm we allege, the only harm we allege, saltwater intrusion had already occurred. Frankly, it's a little bit of a perplexing ruling because this case is about so much more than saltwater intrusion. It's about the conversion of these 485 acres and the establishment of a highly controversial mitigation bank that everyone from South Carolina state agencies to other federal agencies said should not be approved at this particular location given the facts. On appeal, the government has also raised standing as a basis for dismissal of the litigation. I'll start, I guess, by addressing standing just since it is a threshold issue for the court. As this court and many others have noted in the environmental litigation context, standing is not an onerous burden for us. It's simply do we suffer some injury in fact that is caused by the challenged activity and that is redressable. I think it's pretty clear from the case law that those injuries can be injuries to recreational, aesthetic, and conservation interest. We submitted affidavits in district court that explained exactly that as to our injury. We have one from the director of the South Carolina Coastal Conservation League explaining that he uses this area. He watches wildlife, ducks specifically, and migratory birds. He recreates in the area. He goes to the adjacent Savannah National Wildlife Refuge all the time and that this project as a whole is going to impair those uses and enjoyments of the area. Thus, his injury is caused by these permits and it remains redressable by the court because the permits are still valid. No conversion actually has occurred. Secondly, we have... I'm sorry, counsel, can I just stop you? Sure. I think you can clear this up for me. So, right, I understand your argument to be that no conversion to salt marshes has yet occurred and that the intrusion that has occurred could still be remedied. Yes, Your Honor. It could still be undone, but my question is what's the court's authority to order Southern Coast to take that remedial action? What I understood the district court at least to be getting at was this idea that maybe the conversion hasn't happened yet, but it's underway unless something happens to stop it and the court doesn't have any power to order the relevant parties to stop it or to undo the damage that's already been done and that's why it's not redressable. Okay. Yes, Your Honor. Let me try and address your question in a couple of steps. First of all, we dispute that any change at all has happened at the site and we have affidavits on that point that we submitted in district court and the district court didn't reference in its decision. Those affidavits say, you know, very clearly that the measured salinities of 3.4, it remains a freshwater wetland. They do say that and they say it would take several years before it became a salt marsh, but it will, right? I mean, over time. I don't think it's clear that it will. I mean, I think the Corps of Engineers in briefing in district court said that the work that is required under Nationwide Permit 27 is required to make this a salt marsh. So one of those things that the permit authorizes is removal of an embankment on the site and filling wetlands and leveling natural elevation to allow more saltwater intrusion to occur. None of that work has taken place. So it's your contention that if all that happens is sort of status quo, the flood, I can't remember what they're called, the water control doors basically stay open and there is saltwater intrusion, if that continues, if status quo were to continue for several years, there would still not be a salt marsh. Well, I think it's interesting and this is very clear in the record. What South Coast says is since 2011, they've been opening those water control structures and allowing water from the river to come in and no conversion has happened yet. So our position is that this conversion may or may not work anyway. It's certainly not clear that it is going to happen anyway. Everybody in this case says that the permit is required to make the conversion and more importantly, the permit is required for what is called restoration and for the establishment of this as a mitigation bank. That I understand, but if you're damaged, if you're injured, I'm sorry, is the conversion to the saltwater marsh. I'm just trying to figure out whether that will happen even if there's not a permit and not a mitigation bank. We dispute that that will happen anyway. I don't think the evidence at this point before district court shows that that is going to happen anyway. I mean, as I said, the salinities, our three experts all say it remains a freshwater wetland. But if those doors stay open, it won't become more saline over time? I think there's, you know, it's very, this is a very unnatural and very complicated factual system. What is happening, as you may have garnered from reading the briefs, is that saltwater is intruding further up the Savannah River because of harbor deepening. At the same time, however, there are three dams upstream that are releasing large amounts of freshwater. When the salinity was actually tested about a year ago, there had been a significant amount of releases, we think, from those dams, and their experts said that, and the water in the river was actually relatively fresh and not salty. So I think it's certainly a question of fact as to whether this is going to happen anyway, and our experts disputed it. The other thing that I think addresses your point to some extent is that it could easily still be managed as a freshwater wetland. I mean, there's no question about that. But there's no, there's no legal obligation to manage it that way? There's no legal – That a court could enforce. That's the redressability. There's no legal obligation to manage it that way. However, the Corps' own documents, the Mitigation Banking Approval Instrument says very explicitly, it's at JA 80, that if the mitigation bank is not approved, the property owner is likely to continue to manage this as a freshwater wetland. That is enough under the case law for us to demonstrate redressability. Let me turn just briefly to the district. I'm sorry, Your Honor, do you – I'm looking at your brief, and I thought I understood your argument to be that you have these three experts who all said that it's not yet converted and that it will take many years for this to occur, and that it could be – it's not irreversible. It could be reversed if you started flooding it with the freshwater. But that does seem to me to – maybe I misunderstood your brief, but that seems to me to be saying this is going to happen. It's just going to take a long time. I think if you're reading our briefs, it's that we concede that point. We certainly didn't intend to do that. I think our position is it may or may not convert. It certainly hasn't happened at this point. As I said, I'd like to just briefly turn to the mootness holding by the district court. That is, I think, the clearest example of error in the ruling below. There was no question there was a factual dispute that was material on mootness. I'm sorry, Judge Hamilton, I see you have a question. Maybe I misunderstood you, but did I understand you to say that if they opened the floodgates that that would let in fresh water? It really depends on the day and what has happened within the river system. So on days when – Well, the floodgates don't face the river, do they? The floodgates – They face the marsh, don't they? The floodgates allow river water to enter the property. But is it direct entry or does it get into the marshes and then come in? They own, in my understanding of the site – and again, this may be a better question for South Coast lawyer – my understanding is they own everything up to the entry of the river. There is a marsh on the – a tidal marsh at the front of the site that connects the site to the river that's a salt marsh that, you know, has – Let me put it this way. Is the river, the Savannah River in that area, is that rimey or saline – contains saline or is it fresh water? It varies. That's the – it – saltwater intrusion has gone further and further upstream because of other core deepenings. On the days where they actually did the measurements this time last year, the salinity in the river was around 2.8. That's pretty fresh, not even close to saline. So it does – there's a lot of variability in it, which I think calls into question whether this is going to be a successful project or not a successful  Thank you. You're welcome. Yes. With respect, again, to the District Court's ruling on mootness, as I said, there was a pure, you know, factual dispute about the affidavits. The District Court found we did not contest their salinity numbers and so all the harm here had occurred. The missing piece, however, was that we did contest whether this had been a conversion very clearly in our affidavits and that was not addressed. So we think, you know, at a sheer minimum, the case should be remanded to District Court for a reconsideration of the factual issues surrounding – surrounding mootness. But more broadly, on the mootness point, the District Court's error was also a legal one. As the Court is well aware, the mootness standard is is there any effectual relief whatsoever that can be awarded? We have six claims that even if a full conversion had occurred, which, again, we dispute, the validity of the mitigation banking instrument remains a live issue which the Court can clearly provide relief upon and we think, you know, that in and of itself would prevent mootness of the entire – of the entire case. And then finally, as a, you know, kind of more procedural technical matter, we also had a pending motion to amend before the District Court which was denied for the same reasons that the District Court found the case to be moot. In other words, he concluded that because, you know, our case – he could provide us with no relief, he would also deny the challenge to the court's failure to consider cumulative impacts because there is a second proposed mitigation bank which would do the exact same thing as this one, convert freshwater wetlands to saltwater. It's the same project proponent in our understanding and it's another 300 or 400 acres. We sought to add – excuse me, I'm sorry, Judge Hamilton. Is that the Murray Hill project? That's the Murray Hill project, yes, Your Honor. Well, based on my research, the Corps of Engineers has yet to approve that project. The Corps has yet to approve that project and our claim that we sought to add was that in approving this project, the Clydesdale project, the Corps was aware of that project. It's referenced in the mitigation banking instrument approval that there's a second project coming and our claim was that the Corps failed to consider the cumulative impacts of these two projects. The draft public notice announcing that project came out, you know, in the midst of this litigation and that's when we sought to add a claim about it but unfortunately we never – we never were allowed the chance to do that. I see that I'm over my time. Thank you, Ms. Warman. Mr. Ludman, Lundman. Hi, good morning. May it please the Court, Robert Lundman representing the Corps and EPA. I think the easiest way to get rid of this to affirm the district court here is on redressability. South Coast controls the gates that link their property to the river and those gates since 2011 have been open. The river water now flows into the impoundment, flows out of the impoundment through those gates and that is the harm that plaintiffs here were trying to prevent. So vacating, setting aside the Corps' permit approval here, the authors – the verification that nationwide permit 27 applied or setting aside the mitigation bank would not have any on-the-ground effect here and their injuries simply would not be redressed. They say, well, maybe it would be and they're right that on page 80 of the JA it says it's possible that things would stay the same but we now have, since 2011, we have this connection between the river and the impoundment and that's increasing the salinity of the impoundment. The salinity of the impoundment is now higher than the river water when it was measured as the opposing counsel mentioned and the result here is just not a redressable injury. But the river water, it fluctuates in salinity, doesn't it? It does. In the mitigation banking documents and the Corps' analysis explains that the impoundment is going to fluctuate as well. What plaintiffs want is that the system that South Coast used to implement where it opened the link to the canal, the freshwater canal in kind of the northern side of the property and brought in freshwater, that they keep doing that, that they keep bringing in freshwater, that they keep the gates linking the impoundment to the saltier river water closed and that they maintain this artificial clean freshwater impoundment. There's no requirement here in the Clean Water Act that South Coast do that. There's no requirement under the APA that the Corps require them to do that and the Corps couldn't. That's their own property and they get to make that choice on how to operate it. There's just no hook here for the Corps to redress that injury by the plaintiffs and it doesn't matter that the conversion is not complete. If this was a case where setting aside the government action would stop the conversion or reverse the conversion, then there would be redressability, but we don't have that. Experts say that if you continue to do what they're doing, as you say they lawfully can, that there's question whether or not this will become saltwater marsh. That's what they want to prevent. Well, it's not enough for them that South Coast just keep doing what they're doing. They keep it freshwater marsh and their experts say this. They have to keep bringing in the water from the Army Corps' canal on the other side of the property. Well, you built it for that purpose, didn't you? When you dredged the Savannah River and you ran that canal to bring fresh water to help, didn't you? Right. To the Wildlife Refuge and other area properties. Well, why wouldn't you? You represent the interest of the United States people. Why don't you want it to be fresh? We're going to run out of fresh water in the world. Why do we want to continue to increase the saline aspect of these waters? Well, there's two answers to that. First, yes, with respect to the Wildlife Refuge, which is a federal property, we keep bringing freshwater into that to maintain a freshwater wetland on 20-some thousand acres bordering close to this property. But with respect to this property, we don't have a way to require South Coast to keep it a freshwater impoundment. They control their gates. It's their property and they have the right to bring the water in as they see fit. And here, what they have done, they've decided they want to create this mitigation bank and the Corps approved the instrument for that based on restoring the natural connection between the river and their property by removing the embankment that divides the two. Right now, they're opening the gates along that embankment to bring water in, but what they want to do is remove the embankment. But when you say restoring, how far back are we going to go? Well, I mean, that's... Weren't these rice, wasn't this for rice production of rice? Excuse me? Was there rice production in this area? There was rice production, right. So the historical... So since 1765, South Carolina's been involved in rice production down there. Do you know that? Right. So it has a long history of being an impoundment. And why do you... Well, it's a long history of impoundment, but it was fresh water for rice growth, wasn't it? Right. During the rice growing era, it was fresh water. Yeah, exactly. And so what are you restoring it to then? You seem to be... You got a rush to make it salty, but the restoration would make it fresh, wouldn't it? Well, you know, there's different ways to look at the restoration here. I'm going to 1765. You got something further back than that? Well, the idea here is there's an embankment and a river and an impoundment on the other side. And the restoration here is removing the embankment, linking up the river, the salt marsh along the river with what would become salt marsh inside. And so that creates not this impoundment, embankment, artificially managed zone. And another point I want to get to about the JA is the Joint Appendix. The Corps explains on pages 81 and 82 that we can't just expect South Coast to continue to operate its property in the way that the plaintiffs here want them to. There's no requirement for that. And so what the Corps is looking at is, is it better to create a natural, restore the natural elevation, restore the natural connection with the river, or just hope that South Coast is going to continue doing what it did for a while but hasn't been doing since 2011? Let's deal with the mootness. The mootness question is this. If you allow them to do what this national permit does, it definitely will become, it definitely will become a saltwater marsh. But they're saying by their experts that if you don't permit it, even if they continue to do what they're doing, it might not become. That in itself is an impact and a relief for them. That's what Counsel Argen said. He said that our experts say it may not happen. If it does, it may be a century from now. And maybe the ecological systems can adjust to man's always, never, ever ending, you know, tinkering with the waters. But it may not. But if you allow them to do this, it will happen. Isn't that redressable injury? That's an impact? I don't think that is redressable injury because I think it's too speculative here that the fact that the South Coast has restored the connection to the river by opening the gates will not lead to a saline impoundment while removing the embankment would. There's no evidence in the record that the amount of flow of water differs in a way. You know, they don't have a declaration that says, okay, sure you've opened the gates and created this connection with the river. But what you need, that's not going to actually lead to the same amount of saline water that would enter if the embankment was removed. The reason the embankment is being removed, and the CORS documents explain this, is in order to restore the natural elevation. It's not to allow more and more salt water in. It's to restore the natural elevation and to create a continuous salt marsh that's larger than the current one that exists. I think it's just an issue of timing. And that, you know, comes down to the sort of speculative injury that under the Lujan test to satisfy redressability, it can't be just speculative that there may be some order that could lead to some sort of relief. It doesn't sound like speculative. You just admitted, you said, to create salt water marshes larger than the one that exists. Well, I think that... You clearly say that what you're doing is going to make it bigger and saltier. What they're saying is that, no, if we just stop your hand right now, your permitting hand, that will have an impact on what we think that it's in a larger interest of fresh water being in there because, as you know, it's moving higher and higher upriver. Right. It's already beyond, well beyond this problem. The point is, it doesn't stay fresh water unless South Coast pulls fresh water out of the canal, the northern side canal, and puts it into the impoundment. Right now, there's the connection. The conversion is occurring. And they're speculating of, well, it could or could not occur at a certain time frame if the impoundment was, if the embankment was removed. It may not occur within months or years. It may be longer than that. But that's the case with the gates open now, too. And we can't just guess and say, well, it could be longer. That's speculation. We need something likely to satisfy the regressibility prong. It's the same issue under mootness. With respect to mootness, to have relief, to avoid having a case be moot, it has to be effective or meaningful relief. And that's the same thing that's lacking here for the same reasons as regressibility is a problem for their standing. Council, can I ask you a question? Is it possible that there's an independent interest in the embankment, sort of apart from whether it's salt water, fresh water? I thought maybe one of the plaintiffs alleged in his allegation that he enjoyed the embankments themselves for their aesthetic value. It was one of the things he liked about the area. Is it possible that there's sort of a separate injury from removal of the embankments? Or do you think not? I don't think so. I did not see that in their brief. I did not see any injury that they've argued that they are injured by the act of removing the embankment and putting the embankment into, depositing fill the embankment into the existing holes and ditches alongside of it. So I don't think they've argued that. Do you think they've waived that argument? I think they've either waived it or they just didn't make it. Are there any historical matters that the court has taken into consideration? Yes. So the court, part of the court process here is to analyze the history of the area. The embankments that are there are not the original embankments from the colonial 1700 period. They're 1950s era embankments. And so there's no kind of general National Historical Preservation Act concern about removing these embankments. These are not... I know you spent some money on to remove a sloop that was found on the Clydesdale plantation. And the court spent some money on restoring that. So you do spend money on something that you... Sure, if it's... I mean, that's a part of the process is a review of the historical impact. And you could help with some of this fresh water in terms of helping to reduce the salinity of the river by doing things, the dam, the canal. Couldn't you? You could help with that if this permit wasn't allowed. Couldn't you help with making the river fresh water? Well, there is fresh water there. No, I didn't ask that. Could you help? Could the court help like you did when you dredged the lower savanna? You brought in the canal to bring in fresh water. Couldn't you help? Or you just want to stop yourself? Well, I think the court's analysis here, and we're not onto the merits of this case, but it's understanding, is that this will make the environment better. And the court's... If you look at the mitigation banking instrument approval document and the nationwide permit 27 verification by the court, it explains why across a variety of measures this project is good for the environment. Now, plaintiffs say, no, it's not because of this fresh water impact, the loss of the fresh water. But the problem they have is their injury from that fresh water loss has both occurred and can't be remedied by any order of the court. And so there's no meaningful relief that can be awarded. It's moot. Or if you look at it through the other Article III kind of partner of standing, there's no redressability. But either way you kind of frame it, they're in the same place, which is no Article III case or controversy. Unless there's more questions, I'll leave the rest of my time for Mr. Barnett. All right. Brian. Please support. I'm Stan Barnett. I represent South Coast Mitigation Group. I'm the owner of the property we've been talking about here. I just want, I don't want to repeat what my colleague has said. He's done a fine job. But I want to address some things that counsel for the league said  She mentioned state agencies, plural, being opposed to this project. One of the things that I want to address One man in one state agency is not happy with the idea that the impoundment would stop be managed as a duck impoundment. I suppose he likes ducks. He's with the Department of Natural Resources. The project is supported by our state's environmental agency, the South Carolina Department of Health and Environmental Control, as well as the Department of Transportation, the State Ports Authority, because there is a need for mitigation credits that could be used for projects, public projects, in large part, highway projects, things like that. As far as the likelihood of a salt marsh being, growing up inside what is now a managed impoundment, right outside the impoundment, right outside where the salinity in the water is less than it already is inside the impoundment. There is a thriving salt marsh with all of the salt marsh plants. I've listed them in the brief, Spartina, Alterniflora, things that your honors would be familiar with if you're crossing a salt marsh area. There is throughout the league's arguments a theme which is that somehow that salt marsh, that type of marsh environment, would be less environmentally valuable than this managed duck impoundment which is flooded a few months of the year and drained for the rest of the year. Salt marsh environments are regularly touted and have been for decades now as some of the most productive environment that we have. This part of the Clean Water Act that we're talking about, Section 404, began its life, legally, in terms of its enforcement with efforts by the Corps of Engineers, I know because I was there, I was a lawyer with the Corps of Engineers for 12 years, to stop the destruction of salt marsh environments. This argument by the league turns all of that on its head that somehow this unnatural environment, they say, which is only maintained at great expense by my client is more valuable than the natural salt marsh environment which is right outside. So I don't think there's any question that a full return of flow and interchange of flow between the area that is now an impoundment and the natural river system will result in the same marsh environment which is currently outside the dikes regenerating itself inside the dikes. What year did you go back when you said a return to this flow? Well, by that I mean integrating the impoundment with the natural system. I'm not How long has the impoundment been there? It's unclear. A lot of numbers have been thrown around. There's nothing in the record that shows when the area was part of the rice cultivation. It was in antebellum times. I don't know if it was colonial times. I haven't done the research. There's nothing in the record that tells us. But at some point before the Civil War, it was a rice plantation, rice fields, when the Savannah River was fresher because it had not been at that point deepened by the dredging that has taken place in the last hundred years. So today I mean, it's amazing how neither you or the Corps have any idea about restoration, but you call the project restoration. I think by that they mean integrating an unnatural area with the natural environment. That's what they mean. Restoring it to be a part of the natural environment. The natural environment now is the Savannah River with the salinities that it experiences in part because of changes in the depth of the river and also in part because of the dams. As you may know, the Savannah has a number of large impoundment power dams managed by the Corps of Engineers and when they release a lot of water from those dams then the river gets a little fresher. But the existence of the tells us all that it is saline enough, brackish enough that these plants that thrive in that environment are living there. And the fact that they are living there means that it is salty enough. But if you are wrong and they're right that there is a reason to make it less salty do you agree that this permit would be an injury to that? Well, the only permit at issue is the nationwide permit 27. The approval of the mitigation banking instrument is not a permit per se. But that's part of what this litigation is about. So would you agree that that would have an impact on their position by allowing these changes? It certainly would have an impact on my clients. I understand it because your client has a That's why we look at mootness very carefully because there has been no situation where there can be any relief at all. But it sounds to me, it starts with your saying, as you rightfully said I don't know what the fuss is about. Saltwater marsh is the best thing that can happen down there. You might be right. I don't know. But they say otherwise. And we're not here to decide that on the merits. We're deciding only that whether or not it is totally moot what they're asking not to be done. The only harm that they've alleged is the physically concrete harm that gives us jurisdiction in a case like this is the entry of salty water from the river into the impoundment. That's all that they allege in their complaint. Every one of their causes of action is premised solely on that as a harm. But that's already occurred. And as my colleague pointed out, the only way to undo that would be to force my client to never again let that salty water back into the impoundments and to take steps to bring in fresh water so far as long as the Corps continues to bring it into that area. It also would require my clients to continue to maintain the dikes. It's not a passive activity. They erode away. They blow out. It's not in the record, but that happened last year. If they stopped maintaining the dikes, then eventually they would go away. The area would gradually become part of the natural environment outside all by itself. So I don't see how the Court can order or do whatever it wants, but I don't see that there's authority for the Court to order my client to do those things to stop letting salt water in to continue to maintain the dikes. The Court doesn't have to order that. The Court can just say that it was inappropriate for the District Court at this point to say it was moot and not look fully at the experts to say that doesn't require you that's a fallacy, a false dilemma. But if the harm that was alleged has occurred, which it has, then it seems to me that jurisdiction is gone. The argument that somehow the approval of the mitigation banking instrument all by itself, regardless of any physical reality, is a harm I think is a fallacy. Nothing will happen as a result of that mitigation banking instrument being approved. Let me just ask about that. I think in its first order, denying the first motion to dismiss, the District Court kind of said look, when you look at it practically this whole thing is being driven by the mitigation bank. So if that were denied I thought there was at least a suggestion that this might in fact be maintained as a fresh wall. Well indeed. He said it was the driving force. Right. And that is correct. But then when he invited the expiration of salinities, which had not been done at this point, and when it was determined that the harm that they sought to prevent had already occurred then there wasn't anything left for the Court to do. But I guess So what is your position on if the mitigation bank approval were denied, if the permit were denied, what would happen? What would your client do? I don't know. They would continue to try to make money on the property. Is there any chance that they would return it? I don't want to use restore because that has a different meaning, but return it to a freshwater impoundment? Well that's what it is today. It is a less Might they close the gates? And stop having the intrusion of salt water? That is not pragmatic for them. The affidavit of Mr. Brown, I think it's the first affidavit talks about that they had discovered that it was too difficult for them to make use of the Corps' system and that's why they stopped doing it. That's why they went to the The water in the river is not so salty that they can't continue to manage it as a duck impoundment. This business of fresh and saline there are more terms of art So basically your client is not closing those gates and doing the freshwater from the canal? They have concluded that that's not practical. No other questions? I appreciate the court's time. Ms. Wallinick you have some time reserved. Your honors I think it is important to say we are just here on mootness of standing as you noted Judge Gregory at this point and really this case is all about the mitigation bank. The Corps' document approving that bank said quote If the proposed mitigation bank is not approved the freshwater impoundment on the project site would probably continue to be managed for private recreational purposes. In our view invalidating both of those two approvals would clearly redress our injury just based on this statement by the Corps that it's all about the bank. If they cannot establish mitigation bank the site may likely stay a freshwater impounded What do you do with what your counterpart just said which was even if this stuff is denied they're not closing the gates they're not bringing in the freshwater from the pipe Your honor I don't think that is in the record He says there's an affidavit explaining why that's not practical anymore That to me I don't recall that in the record that is a certainty I think it's unclear what will happen if the two approvals are vacated but we still have effective relief obviously that the Corps could award us at this point As to the Corps of Engineers' argument that they cannot require South Coast to bring freshwater in that is correct. We absolutely agree that that is true but at the same time this case is about more than that. They have approved a mitigation bank and it's true that they can't require freshwater to come in but it's also true that South Coast isn't necessarily entitled to create a mitigation bank on this site under the guise that it is a restoration Relatedly on the whole notion that this could happen anyway, if this happens anyway, if there were no Corps permits at issue in this case, if this were to happen anyway South Coast would not have a mitigation bank They obviously have to have an approval to have that bank Mitigation banks are created for very limited specific purposes. They are based on restoration, creation or enhancement of aquatic resources. They have to have the restoration here approved by Nationwide Permit 27 to have the mitigation bank. If this conversion just happens anyway they don't have a mitigation bank and that is really what is the driving force of this entire case and we believe we still have causation addressability and the claims are not moved It's a fairly straightforward issue that the approvals are both still out there If anyone wanted to move this case the Corps of Engineers if they were to rescind their permits or South Coast were to say that they didn't need it the case would clearly be moved at that point but that's not what has happened. The permits are there The work hasn't been done The conversion has not occurred There's at least a factual dispute about that and the case is not moved and we still have standing Thank you Thank you We'd ask for reversal of the district court opinion in this case I don't want to give you a chance to respond that's why I waited but this will save a 28J type letter Mr. Baird, can you tell me what the site is to the affidavit that you said that clearly says what your client will do if they lose My colleague has pointed that out It's at JJ367 Thank you Thank you, counsel We're going to ask the court the deputy clerk to adjourn the court for the end of the session and then we'll come down and greet counsel This honorable court stands adjourned God save the United States and this honorable court
judges: Roger L. Gregory, Pamela A. Harris, Clyde H. Hamilton